812 A.2d 640

**In re Appeal of Rolf LARSEN, Appellant.**

**Special Tribunal Docket No. 2000–1.**

Special Tribunal of Pennsylvania.

Oct. 24, 2002.

458

460

Robert A. Felkay and James B. Lieber (argued), Pittsburgh, for appellant.

Vincent J. Quinn, Chief Council and Gregory D. Anthony, Deputy Council, (argued), Harrisburg, for appellee.

Before HUDOCK, FORD ELLIOTT, FRIEDMAN, STEVENS, TODD, KLEIN and BOWES, JJ.

OPINION BY HUDOCK, Presiding Judge.

This is an appeal by Appellant Rolf Larsen, former Justice of the Supreme Court of Pennsylvania, from the order of the Court of Judicial Discipline that removed him from office, declared him ineligible to hold future judicial office, and disbarred him from the practice of law. The factual and procedural history underlying this matter is lengthy and complex. However, it must be addressed fully in order to provide a proper context in which to understand the basis for the present appeal.

Appellant was elected to office as an Associate Justice of the Supreme Court of Pennsylvania in November of 1977. He served in that capacity for a full ten year term and was

retained for a second term in 1987. The Pennsylvania Judicial Inquiry Review Board (the JIRB) informed Appellant in May of the following year that it had received complaints of misconduct against him and that formal proceedings had been initiated. On July 17, 1991, upon completion of a series of investigations, the JIRB reported to the Pennsylvania Supreme Court that Appellant had created the appearance of impropriety by engaging in ex parte communications with a trial judge in a pending case. A three justice panel of the Supreme Court of Pennsylvania adopted the JIRB's recommendation and issued an order on October 14, 1992 publicly reprimanding Appellant. *In re Larsen*, 532 Pa. 326, 616 A.2d 529 (1992). Appellant then filed a petition before the full Supreme Court alleging, *inter alia*, that several Justices had engaged in various forms of judicial misconduct. In response to this petition, the Attorney General of Pennsylvania launched a grand jury investigation. Ultimately, the grand jury issued a presentment finding that no credible evidence supported Appellant's allegations against the other justices. However, the grand jury announced that it had discovered evidence of misconduct by Appellant in addition to the incidents reported by the JIRB.

On October 22, 1993, the grand jury formally recommended that criminal charges be filed against Appellant. Six days later, on October 28, 1993, the Attorney General of Pennsylvania filed criminal charges against Appellant related to his unlawful acquisition of prescription medications. As a result, the Supreme Court of Pennsylvania relieved Appellant of all judicial and administrative duties as an Associate Justice. Appellant was not suspended from office at this time nor did the Supreme Court suspend his pay. The Judiciary Committee of the Pennsylvania House of Representatives thereupon launched its own investigation of Appellant.

On March 10, 1994, the Judicial Conduct Board of Pennsylvania (the Board) filed an application with the Pennsylvania Court of Judicial Discipline requesting the Court to suspend Appellant with pay pending the outcome of Appellant's criminal trial and the Board's own investigation. This application

was docketed at Number 3 JD 94. The Court of Judicial Discipline denied the Board's request without issuing a published opinion.[1]

Appellant subsequently was tried in the Court of Common Pleas of Allegheny County on the criminal charges initiated by the Attorney General. During a week-long jury trial, evidence was adduced indicating that Appellant had been in therapy since the 1960's to treat chronic dysthymia (clinical depression) and concomitant anxiety. Once Appellant entered judicial office, he became the subject of media scrutiny which caused him to fear that the public would learn of his mental illness and that he would be stigmatized as a result. Appellant convinced his attending physician that it was extremely important to prevent the media from discovering the truth about his mental illness. The physician therefore issued prescriptions in the names of third parties for the medications intended for Appellant's use. Furthermore, Appellant's perceived need for secrecy was so intense that his physician kept no written records concerning Appellant's therapy. For a period of twelve years, Appellant's physician prescribed various medically necessary psychotropic drugs, including Valium ® (diazepam) and Prozac ® (fluoxetine), to members of Appellant's staff so that Appellant could follow his treatment regimen in relative secrecy. On April 9, 1994, the jury acquitted Appellant on multiple counts of unlawfully procuring a controlled substance, but found him guilty on two counts of criminal conspiracy.[2]

After the verdicts were returned in the criminal matter, but prior to the imposition of sentence, the Board filed a second petition requesting that Appellant be suspended from office.

1. The Board was created by a 1993 amendment to Article V, Section 18 of the Constitution of the Commonwealth of Pennsylvania. Under this amendment, the Judicial Inquiry and Review Board was eliminated and its function was assumed by the newly created Board. The Court of Judicial Discipline also was created by the 1993 amendment to Article V, Section 18 of the Pennsylvania Constitution and is the adjudicative body that rules upon formal charges filed by the Board against a justice, judge or justice of the peace (district justice).

2. 35 P.S. § 780–113(a)(12) and 18 Pa.C.S.A. § 903, respectively.

The Court of Judicial Discipline held a hearing in the matter on May 25, 1994, and suspended Appellant without pay on June 3, 1994. The Board then filed a Complaint in the Court of Judicial Discipline requesting that action be taken against Appellant based upon his convictions in the Court of Common Pleas. The complaint was docketed at Number 4 JD 94. On May 24, 1994, while this matter was pending before the Court of Judicial Discipline, the Pennsylvania House of Representatives adopted seven Articles of Impeachment against Appellant accusing him of misbehavior in office. The Senate of Pennsylvania incorporated these Articles of Impeachment as part of its Writ of Impeachment Summons.

On June 13, 1994, the Allegheny County trial judge sentenced Appellant to serve one year of probation for each of the two counts of criminal conspiracy. In addition, the trial court found that Appellant had committed an "infamous crime" as that term is contemplated by Article II, Section 7 of the Pennsylvania Constitution. The trial judge therefore entered an order removing Appellant from judicial office.[3]

On July 5, 1994, Appellant filed an omnibus pretrial motion in the matter pending before the Court of Judicial Discipline. Among other things, Appellant asserted that the Court lacked jurisdiction because he no longer was a judicial officer after being removed from office by virtue of the trial court's sentencing order. The Court of Judicial Discipline granted the motion in part, denied it in part, and ordered the parties to file briefs on certain points. Before the motions were resolved by the Court of Judicial Discipline, the Pennsylvania Senate took up the matter of Appellant's impeachment.

3. The convictions were affirmed on direct appeal, but the judgment of sentence was vacated August 5, 1996, on the grounds that Appellant could be sentenced on only one count of criminal conspiracy. *Commonwealth v. Larsen*, 452 Pa.Super. 508, 682 A.2d 783, 798 (1996). The Supreme Court denied allowance of appeal on March 19, 1997. *Commonwealth v. Larsen*, 547 Pa. 752, 692 A.2d 564 (1997). Appellant was resentenced on May 27, 1997. The trial court ordered Appellant's removal from office, imposed twenty-four months of probation and directed Appellant to serve two hundred forty hours of community service. The record does not indicate that Appellant ever pursued an appeal as to this sentence.

On October 4, 1994, the full Senate voted to acquit Appellant on six of the counts set forth in the Writ of Impeachment Summons, but found him guilty, pursuant to the second Article of Impeachment, on the basis of improper *ex parte* communications concerning a matter that had been before the Supreme Court. The Senate then adopted Senate Resolution No. 163, which removed Appellant from office on different grounds than those relied upon by the court of common pleas and declared him ineligible to hold any office of trust or profit in the Commonwealth of Pennsylvania at any time in the future.

On January 27, 1995, the Court of Judicial Discipline entered an order continuing Appellant's disciplinary trial pending the resolution of Appellant's direct appeal in the criminal matter. After the stay was vacated, several years were consumed in resolving Appellant's many pre-trial motions. The motions all were decided via published opinion filed August 4, 1998. *In re Larsen*, 717 A.2d 39 (Pa.Ct.Jud.Disc. 1998). A disciplinary trial was conducted in June of 1999. On December 31, 1999, the Court of Judicial Discipline entered an order and opinion holding that Appellant was liable for, and subject to, disciplinary sanctions for judicial misconduct based on his felony convictions. *In re Larsen*, 746 A.2d 108 (Pa.Ct. Jud.Disc.1999). A sanctions hearing was held on February 4, 2000. On that date, the Court of Judicial Discipline entered an order stating that Appellant was removed from judicial office and that he was ineligible to hold judicial office in the future. This order also disbarred Appellant from the practice of law in the Commonwealth of Pennsylvania. This was the third time Appellant was removed from office, but the first time he was disbarred. On March 3, 2000, Appellant filed a timely notice of appeal to the Special Tribunal created under Article V, Section 18(c) of the Constitution of the Commonwealth of Pennsylvania.

On March 22, 2000, the initial panel of the Special Tribunal was selected by lottery from the pool of eligible Judges of the Superior Court and the Commonwealth Court of Pennsylvania. The selection procedure was conducted in the presence

of chief counsel for the Board and a representative acting on behalf of Appellant. Seven judges were selected at random. Subsequently, the composition of the Special Tribunal changed several times owing to various motions, including motions for recusal filed by Appellant, the *sua sponte* recusal of several judges, and the ineligibility of several judges who took senior judge status upon reaching retirement age. On April 15, 2002, the Special Tribunal heard oral argument by counsel for Appellant and by the Chief Counsel for the Board.

This appeal identifies twenty-three separate issues for our consideration. Because the claims thus presented are duplicative, we have paraphrased them for clarity of understanding as follows: (1) whether procedural improprieties that allegedly occurred in this matter invalidate certain determinations of the Court of Judicial Discipline; (2) whether the Court of Judicial Discipline possessed jurisdiction and authority to act in this matter on the grounds of mootness; (3) whether the Court of Judicial Discipline possessed the authority to impose the sanction of disbarment from the practice of law; (4) whether Appellant's due process and equal protection rights were violated; and (5) whether Appellant's motions for recusal were improperly denied by the Court of Judicial Discipline and the Special Tribunal.

Before addressing these questions, we begin by discussing the nature of our jurisdiction and authority as well as the standards that govern our review of this appeal. Under the Pennsylvania Constitution, disciplinary matters pertaining to the suspension, removal from office, discipline and other sanctions that concern justices of the peace (district justices), judges of the Courts of Common Pleas, the Superior Court and the Commonwealth Court, and justices of the Supreme Court are governed by Article V, Section 18. This section of our constitution defines the path that any investigation and consequent disciplinary proceedings must follow upon the Board's receipt of a complaint alleging judicial misconduct. Pa. Const. Art. V, § 18. It is the function of the Board to investigate such allegations and, if warranted, to refer a case to the Court of Judicial Discipline for a disciplinary trial.

Decisions of the Court of Judicial Discipline are subject to review under subsection 18(c) of Article V which provides that justices of the peace (district justices) and judges shall have the right to an appeal before the Supreme Court of Pennsylvania, whereas a justice of the Supreme Court itself shall have the right of appeal to a Special Tribunal duly convened under constitutional aegis for the purpose of handling that specific appeal. *Id.,* Art. V, § 18(c).

Our constitution imposes an explicit scope and standard of review upon both the Supreme Court of Pennsylvania and the Special Tribunal for all appeals stemming from the rulings of the Court of Judicial Discipline. "[O]n the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful." Pa. Const. Art. V, § 18(c)(2). Both the Supreme Court and the Special Tribunal may revise or reject an order of the Court of Judicial Discipline upon a determination that the order cannot be sustained under this standard of review. *Id.* Otherwise, the Supreme Court or Special Tribunal shall affirm the order of the Court of Judicial Discipline. *Id.*

 Under well-established Pennsylvania law, "scope of review" and "standard of review" constitute terms of art with related but divergent meanings. "Scope of review" refers to the confines within which an appellate court must conduct its examination of the decision of the lower court. *Commonwealth v. Widmer,* 560 Pa. 308, 317, 744 A.2d 745, 750 (2000). In other words, this phrase denotes "what" the appellate court may examine in conducting its review. *Id.* In Pennsylvania, it is obligatory for a reviewing court to examine the entire certified record to ascertain if the lower court's rationale is supported therein. *Id.* The term "standard of review" refers to the manner in which the record must be examined to answer the questions raised by an appeal. *Id.* at 318, 744 A.2d at 751.

 In consideration of the provisions of the Pennsylvania Constitution, and in light of the well-established definitions

stated above, we conclude that our scope of review encompasses the entirety of the record developed below. Our standard of review is plenary with regard to questions of law. However, our review of the facts determined by the Court of Judicial Discipline is confined to ascertaining whether the record supports the factual findings and whether the sanctions imposed were "lawful."

 The first question we must answer is whether the Court of Judicial Discipline had both jurisdiction and the power to act in the present case. The terms "jurisdiction" and "power" are neither synonymous nor interchangeable. *Riedel v. Human Relations Commission of Reading*, 559 Pa. 34, 39, 739 A.2d 121, 124 (1999). "Jurisdiction" relates solely to the competency of a particular tribunal to determine controversies of the general class to which a specific case presented for consideration belongs. *Id.* "Power" means the ability of a decision-making body to order or effectuate a certain result. *Id.* at 39–40, 739 A.2d at 124. The fact that, in a particular case, a tribunal may not have the power to afford a specific form of relief or to impose a specific sanction does not affect that tribunal's jurisdiction over the general subject matter of the controversy. *Id.* at 40, 739 A.2d at 124.

The Court of Judicial Discipline derives its subject matter jurisdiction and its power to impose sanctions from Article V, Section 18(b) of the Pennsylvania Constitution. This subsection provides that the Court shall have jurisdiction to address the question of whether judicial misconduct has occurred that warrants the imposition of a sanction upon a justice, judge or justice of the peace (district justice) whenever the Judicial Conduct Board files a formal complaint. Pa. Const. Art. V, § 18(b)(5). The power of the Court of Judicial Discipline to impose specific sanctions is conferred by Article V, Section 18(d) of our constitution. This provision states that the Court has the power to suspend or remove from office, order a forced retirement, or "otherwise" discipline a judicial officer depending upon the nature of the conduct at issue in a particular case. *Id.*, Art. V, § 18(d)(1). Under certain circumstances defined by our constitution, the Court's power to

impose a sanction on a judicial officer exists regardless of whether the alleged misconduct occurred while the judicial officer was acting in an official capacity. *Id.*, Art. V, § (18)(d)(1). Prior to the final disposition of a case, the Court also has the power to issue interim orders directing the suspension from office (with or without pay) of any judicial officer against whom formal charges have been filed by the Board or against whom a criminal indictment or information has been filed charging a felony. *Id.*, Art. V, § 18(d)(2). Any such interim order is interlocutory and unappealable prior to the issuance of a final order. *Id.*

In the present case, the Board filed its formal complaint against Appellant after he was found guilty on the criminal charges discussed above, but before sentence was imposed. Appellant was still in office at that time. The Board had both the jurisdiction to conduct an investigation of Appellant on its own initiative, and the power to file a complaint with the Court of Judicial Discipline under the aegis of subsections (7) and (8) of Article V, Section 18(a) of the Pennsylvania Constitution. Pursuant to Article V, Section 18(b)(5) of our constitution, the jurisdiction of the Court of Judicial Discipline attached upon the filing of the Board's formal complaint.

The fact that Appellant faced criminal charges in the Court of Common Pleas of Allegheny County does not alter the Court of Judicial Discipline's jurisdiction to act on a complaint alleging judicial misconduct, nor does it change the jurisdiction of the General Assembly to impeach Appellant. This is so because of the manner in which the Pennsylvania Constitution confers jurisdiction and power to investigate, adjudicate, and punish wrongdoing by a judicial officer of this Commonwealth. Well-established principles of law in Pennsylvania indicate that our constitution is an integrated whole and that effect must be given to all of its provisions whenever possible. *Cavanaugh v. Davis*, 497 Pa. 351, 354, 440 A.2d 1380, 1382 (1982). Thus, the Articles and provisions of the Pennsylvania Constitution must be read *in pari materia* and construed together. *Commonwealth ex rel. Specter v. Vignola*, 446 Pa. 1, 7, 285 A.2d 869, 872 (1971). Whenever there is

any apparent overlapping, ambiguity, conflict or inconsistency, "the specific must prevail over the general." *Id.*

▮ The courts of common pleas derive their unlimited original jurisdiction over both civil and criminal matters from Article V, Section 5 of the Pennsylvania Constitution except as "otherwise provided by law." Pa. Const. Art. V, § 5(b). The amendments to Article V, Section 18 of our constitution act to limit the jurisdiction of the courts of common pleas to consider allegations of judicial misconduct, *qua* judicial misconduct, by conferring specific jurisdiction over such matters on the Board and the Court of Judicial Discipline. However, Section 18 confers no jurisdiction on the Board or the Court to address a criminal complaint. Thus, the Court of Common Pleas of Allegheny County had jurisdiction over the criminal charges filed against Appellant while the Board and the Court of Judicial Discipline had jurisdiction to investigate and address the allegations of judicial misconduct.

▮ Article VI of the Pennsylvania Constitution vests the House of Representatives of the General Assembly with the sole power to impeach holders of public office. Const. Art. VI, § 4. The Senate of the General Assembly has jurisdiction to try an officeholder upon impeachment by the House of Representatives. *Id.*, § 5. By assigning the power to impeach and try an officeholder solely to the General Assembly, our constitution precludes the courts of common pleas from exercising jurisdiction in such matters. *See Specter*, 446 Pa. at 7, 285 A.2d at 872 (holding that specific provisions of the constitution must prevail over general provisions). Moreover, the Pennsylvania Constitution specifically provides that the jurisdiction conferred upon the Board and the Court of Judicial Discipline over the sanctioning of a judicial officer exists in addition to, and not in substitution for, the provisions of Article VI concerning impeachment proceedings for the misbehavior in office of all persons who hold public office in Pennsylvania. Pa. Const. Art. V, § 18(d)(5).

It is quite clear that the citizens of Pennsylvania, when creating and amending our constitution, considered and explic-

itly conferred separate jurisdiction upon the courts of common pleas, the Board and the Court of Judicial Discipline, and the General Assembly over three different types of proceedings that may stem from acts that could be deemed crimes, judicial misconduct, and misbehavior in office. Under our constitution, the courts of common pleas, the Board and Court of Judicial Discipline, and the General Assembly serve as separate tribunals imbued with the constitutional authority to exercise intersecting but non-concurrent subject matter jurisdiction over cases in which a judicial officer has been accused of crimes, judicial misconduct, and acts comprising misbehavior in office.

In light of the above, we conclude that the Board possessed jurisdiction both to investigate allegations that Appellant committed judicial misconduct and to present its findings to the Court of Judicial Discipline in the form of a formal complaint against Appellant. Furthermore, the Court of Judicial Discipline possessed jurisdiction to resolve the allegations of judicial misconduct raised against Appellant and to determine whether sanctions were warranted. The Court also possessed the power to impose sanctions against Appellant. Our next task is to determine whether the sanctions actually imposed were lawful.

Appellant contends that the Court of Judicial Discipline acted in an unlawful manner by suspending him from office without pay. The Court took this action on June 3, 1994, after the jury found Appellant guilty of the two felony offenses discussed above, but before the trial judge imposed sentence. Our constitution states that the Court of Judicial Discipline may suspend a judicial officer without pay upon the filing of an indictment or information charging a felony. Pa. Const. Art. V, § 18(d)(2). The constitution explicitly provides that this action may be taken without conducting a hearing. *Id.* Furthermore, there is no requirement for the Court to await a verdict in the criminal matter. *Id.*

Appellant does not argue that he was deprived of actual notice and a hearing with regard to the suspension

order. Rather, he contends that because the Rules of Procedure for The Court of Judicial Discipline did not take effect until January 1, 1995, the Court had no authority to suspend him in June of 1994. Regardless of whether procedural rules were promulgated and in effect on June 3, 1994, the Court of Judicial Discipline had the power to suspend Appellant from office, with or without pay, because the Constitution of Pennsylvania so states. Pa. Const. Art. V, § 18(d)(1) and (2). Pennsylvania law is well-settled that procedural rules are not ends in themselves, and are not to be exalted to the status of substantive objectives. *McKay v. Beatty*, 348 Pa. 286, 286–87, 35 A.2d 264, 265 (1944). We cannot invalidate an action specifically authorized by Article V, Section 18(d)(1) and (2) of the Pennsylvania Constitution on the grounds that no relevant procedural rule existed at the time the suspension order was entered. Thus, because we find no illegality in the Court of Judicial Discipline's decision to suspend Appellant from office upon his conviction on two felony counts, we cannot reverse the Court's decree.

Appellant also contends that the Court of Judicial Discipline lacked the authority to remove him from judicial office and to bar him from ever seeking judicial office again. On February 4, 2000, after conducting a trial in the matter, the Court of Judicial Discipline entered its order removing Appellant from judicial office and precluding him from seeking such office in the future. Our constitution explicitly grants the Court of Judicial Discipline the power to remove a justice from office. Pa. Const. Art. V, § 18(d)(1). Furthermore, any justice of the Supreme Court who is removed from judicial office pursuant to Section 18 is thereafter permanently ineligible to hold judicial office in Pennsylvania. *Id.*, § 18(d)(3). Thus, the Court of Judicial Discipline acted within the explicit purview granted to it by our constitution.

Appellant's argument in this regard also comprises the claim that the Court of Judicial Discipline's sanction of removing him from office was a moot act because the trial court had already removed him from office as part of the

sentence imposed pursuant to his felony convictions. Furthermore, the Senate had entered a resolution which both removed Appellant from public office and barred him from seeking such a position in the future. The concept of mootness comprises the legal doctrine that an actual controversy must be extant at all stages of judicial review, not merely at the time a complaint was filed. *In re Gross*, 476 Pa. 203, 209, 382 A.2d 116, 119 (1978) (quoting G. Gunther, *Constitutional Law*, 1578 (9th ed.1975)). A legal question can become moot during the course of litigation as a result of an intervening change in the facts of a case or because the law itself has changed. *Id.* at 209–10, 382 A.2d at 119–20. An issue before a court may also become moot if, in ruling upon the issue, the court cannot enter an order that has any legal force or effect. *See, e.g., Pennsylvania Coal Mining Association v. Commonwealth Department of Environmental Resources*, 498 Pa. 1, 4, 444 A.2d 637, 638 (1982) (stating that no purpose is served by passing upon the legitimacy of an order that no longer has any legal force). *See also DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them).

We have already discussed the fact that the trial court's jurisdiction to address criminal charges is a separate matter from the jurisdiction of the Court of Judicial Discipline to consider whether a justice has committed judicial misconduct. Our constitution states that a justice who has been convicted of a felony is subject to sanctions by the Court of Judicial Discipline on that specific basis. Pa. Const. Art. V, § 18(d)(1). Thus, we conclude that the people of this Commonwealth explicitly contemplated and provided for the very situation that arose in this case. Appellant was convicted of a felony in the Court of Common Pleas of Allegheny County. Under Article V, Section 18 of our constitution, the Court of Judicial Discipline had jurisdiction to determine whether this conviction warranted the imposition of sanctions for judicial misconduct. The fact that, ultimately, the Court of Judicial Discipline chose a sanction that had already been imposed does not

render moot the question of whether Appellant committed judicial misconduct. However, Appellant is correct in stating that the sanction of removal from office had become moot in his case because of events that occurred before the disciplinary order was entered.

As discussed above, Appellant was elected to serve on the Supreme Court for a ten year period beginning in January of 1988. His term of office expired at the end of 1997. The Court of Judicial Discipline entered its disciplinary order on February 4, 2000, after Appellant's term of office had already expired. Thus, the question of whether to remove Appellant from office was mooted by intervening events prior to entry of the order at issue. However, the question of whether Appellant would be eligible in the future to stand for judicial office was not mooted by either the trial court's judgment of sentence or by the expiration of Appellant's term of office.

 The Pennsylvania Senate passed Resolution No. 163 in October of 1994, removing Appellant from public office and precluding him from seeking such office in the future. This Resolution did not moot the case in controversy before the Court of Judicial Discipline as to whether Appellant had committed judicial misconduct, nor did it preclude the Court from sanctioning Appellant as authorized by our constitution. The jurisdiction and power of the Court of Judicial Discipline to investigate and sanction judicial misconduct exists in addition to, and not in substitution for, the jurisdiction and power of the General Assembly to impeach and punish wrongdoing in public office. Pa. Const. Art. V, § 18(d)(5). The question of whether the Court of Judicial Discipline possessed the power to impose the same sanction against Appellant that was chosen by the Senate is a separate issue.

 Presently, Appellant's term of elective office has expired. Therefore, even if we were able to find that the Court of Judicial Discipline imposed an unlawful sanction by removing him from judicial office, we could not order Appellant's reinstatement. This issue is moot. Furthermore, by virtue of Senate Resolution 163, Appellant is now ineligible to

stand for any elective office. We have neither the jurisdiction nor the power to address the legality or propriety of the Senate's Resolution. Thus, we have no power to reinstate Appellant's right to seek elective office in this Commonwealth. As such, Appellant's challenge to the legality of that portion of the Court of Judicial Discipline's order which bars him from seeking judicial office must be deemed moot at this time.

 Appellant also challenges the right of the Court of Judicial Discipline to disbar him from the practice of law. Article V, Section 10 of the Pennsylvania Constitution grants exclusive control over the practice of law to the Supreme Court of Pennsylvania. Pa. Const. Art V, § 10(c). Nothing in Article V, Section 18 of the constitution alters this fact. The 1993 amendments to Article V, Section 18 did not divest the Supreme Court of its authority under Article V, Section 10 to control the right of an individual attorney to practice law in this Commonwealth. Rather, Section 18 solely concerns the jurisdiction and power of the Board and of the Court of Judicial Discipline to investigate allegations of judicial misconduct and to sanction a judicial officer by removal from office, suspension from office, censure, or "other discipline as authorized by this section and as warranted by the record." Pa. Const. Art. V, § 18(b)(5). Nowhere in Section 18 of Article V does the Pennsylvania Constitution explicitly state that the Court of Judicial Discipline has the power to disbar an attorney merely because he or she happens to be a judicial officer. Rather, Article V, Section 18 of our constitution grants the Court of Judicial Discipline a general power to impose sanctions upon judicial officeholders. Thus, the specific and explicit power granted to the Supreme Court by Article V, Section 10 to control the practice of law must be viewed as precluding the use of disbarment as a sanction by any tribunal other than the Supreme Court itself.

Our determination that the Supreme Court has exclusive authority to control the practice of law in Pennsylvania has been reached through our independent analysis of the Pennsylvania Constitution. Nevertheless, our decision in this regard is consistent with views expressed by the Pennsylvania

Supreme Court itself following the constitutional amendments of 1993. For example, in *Office of Disciplinary Counsel v. Jepsen*, 567 Pa. 459, 787 A.2d 420 (2002), Chief Justice Zappala observed that the fact the Court of Judicial Discipline and the Supreme Court are both authorized to act in the case of a lawyer who is a judicial officer accused of misconduct does not abrogate the constitutionally conferred powers of the Supreme Court to control the practice of law. *Id.* at 460–61, 787 A.2d at 421. Chief Justice Zappala also opined that, regardless of the nature of the misconduct involved, the determination of whether an attorney is fit to practice law falls within the realm of the Supreme Court's authority. *Jepsen*, 567 Pa. at 465, 787 A.2d at 424. At least twice in the *Jepsen* opinion, Chief Justice Zappala referred to the power of the Supreme Court to supervise the conduct of attorneys as being "exclusive." *See id.*, 567 Pa. at 460 and 467, 787 A.2d at 421 and 425. Indeed, Chief Justice Zappala explicitly held that the Pennsylvania Supreme Court possesses the authority to disbar for misconduct in the practice of law "pursuant to Article V, Section 10(c) of the Pennsylvania Constitution, which grants [the Supreme] Court the *exclusive* power to supervise the conduct of attorneys." *Jepsen*, 567 Pa. at 460, 787 A.2d at 421 (emphasis added). Chief Justice Zappala emphasized this point later in *Jepsen* by stating, "As the 1993 amendment to Section 18 does not expressly divest this Court of our inherent and *exclusive* power to supervise the practice of law pursuant to Article V, Section 10(c) of the Pennsylvania Constitution, our Court retains such authority." *Id.* at 467, 787 A.2d at 425 (emphasis added).

Further evidence of the Supreme Court's judgment that it possesses exclusive authority to regulate the practice of law has been provided by the recent case of *Gmerek v. State Ethics Commission*, 569 Pa. 579, 807 A.2d 812 (2002). *Gmerek* is a plurality decision filed August 23, 2002, which upholds a ruling by the Commonwealth Court of Pennsylvania that the Lobbying Disclosure Act, 65 Pa.C.S.A. §§ 1303–1311, is unconstitutional because the Act infringes upon the Supreme Court's exclusive authority to regulate the practice of law. In

*Gmerek,* the dissent and both opinions filed in support of affirmance indicate that all of the Justices agree the Pennsylvania Supreme Court is the sole authority for the regulation of the conduct of attorneys who are acting in the capacity of legal counsel. Chief Justice Zappala acknowledged in *Jepsen* that the Supreme Court's supervisory power over the conduct of attorneys does not affect the independent authority of the Judicial Conduct Board and the Court of Judicial Discipline to investigate the same conduct for the purposes of disciplinary action pursuant to Article V, Section 18. *Jepsen,* 567 Pa. at 466, 787 A.2d at 424. However, nothing in either *Jepsen* or *Gmerek* indicates that the Supreme Court considers their authority to regulate the practice of law as less than "exclusive." We find that the views expressed in *Jepsen* and *Gmerek* comport with our own conclusion that disbarring Appellant was not a sanction available to the Court of Judicial Discipline.

In light of the above, we must reverse the determination of the Court of Judicial Discipline that it possessed jurisdiction to consider the question of Appellant's fitness to practice law. Furthermore, we must reverse the Court's ruling that it had the power to disbar Appellant from the practice of law in this Commonwealth. Accordingly, we vacate as illegal that portion of the Court of Judicial Discipline's order disbarring Appellant from the practice of law.

Appellant has raised multiple issues pertaining to the alleged unfairness of the proceedings conducted before the Court of Judicial Discipline on the grounds that he was precluded from taking discovery, calling witnesses, and presenting evidence concerning the circumstances surrounding his criminal convictions. The thrust of all his arguments in this regard is that he was deprived of his constitutional rights to due process and equal protection with regard to his disbarment. Because we have concluded that the Court of Judicial Discipline lacked the authority to disbar Appellant, we need not address these claims.

■ Appellant also argues that his rights to due process and equal protection under the federal and state constitutions were violated through his subjection to "triple jeopardy" in that he was tried and punished by three separate tribunals for essentially the same offenses. Appellant's circumstances are not unique. So-called "multiple jeopardy" often exists when acts comprising criminal offenses have civil consequences. For example, a negligent criminal homicide perpetrated by a physician could lead to both criminal charges and to civil liability pursuant to a wrongful death claim. Such an event might also trigger an investigation by the State Board of Medicine with the possibility of the physician losing his medical license.

■ In the present case, Appellant cites neither case law nor statutory provisions in support of his argument. Indeed, he cannot do so because Pennsylvania law is clear that disciplinary proceedings are not criminal in nature and constitutional principles of double jeopardy do not apply to them. *In re Oxman*, 496 Pa. 534, 542–43, 437 A.2d 1169, 1173 (1981). Attorney disciplinary actions do not place an individual in double jeopardy for constitutional purposes even when the proceedings stem from the same transaction out of which a prior criminal prosecution arose. *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 345 A.2d 616 (1975).

We have explained in great detail the manner in which our constitution confers jurisdiction and power to impose sanctions in a case such as this. Our constitution clearly contemplates the fact that a judicial officer accused of criminal offenses is subject to the jurisdiction of the courts of common pleas as to the criminal charges, to the Board and the Court of Judicial Discipline as to allegations of judicial misconduct predicated on those criminal charges, and to the General Assembly on the question of the judicial officer's fitness to remain in office or to stand for office in the future. Although Appellant has provided a narrative explaining why he believes he was treated unfairly, he has not mounted an argument concerning the unconstitutionality of the Pennsylvania Constitution itself, as it applies to him. We must therefore conclude that Appellant

has provided no basis upon which we could predicate relief on this claim.

Finally, Appellant contends that his motions for recusal as to certain judges were improperly denied by both the Court of Judicial Discipline and the Special Tribunal. The standards for recusal are well established in Pennsylvania law. *Commonwealth v. Abu–Jamal*, 553 Pa. 485, 507, 720 A.2d 79, 89 (1998). "It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Id.*

Appellant asks us to conclude that all members of the Pennsylvania judiciary are ineligible to sit on the Court of Judicial Discipline or on the Special Tribunal in this case because the Supreme Court of Pennsylvania has authority over all members of all Pennsylvania courts. Appellant avers that the charges of judicial misconduct against him emanated from the Supreme Court thereby rendering suspect all jurists who are subject to the Supreme Court's authority. However, as discussed above, the criminal charges that led to Appellant's investigation by the Board did not stem from action taken by the Supreme Court. The charges resulted from a grand jury investigation launched because of the accusations of misconduct Appellant levied against other justices of the Supreme Court. In the absence of evidence demonstrating that a particular jurist acted in an improper fashion, from whatever cause, we have no basis on which to even consider Appellant's claim. *See Abu–Jamal, supra* (explaining when recusal is required).

Appellant does argue that the Honorable Esther Sylvester should have recused from the Court of Judicial Discipline on the grounds that she was "involved" with the recusal of two Supreme Court justices on a prior matter. But Appellant has failed to explain the reasons why this alleged involvement created a substantial doubt that Judge Sylvester could act in an unbiased fashion in his case. Furthermore, Appellant has failed to cite either statutory or case law in support of

his position. In light of all these circumstances, we cannot conclude that the decision of the Court of Judicial Discipline was unlawful. Thus, under the standard of review imposed upon this Tribunal by the Pennsylvania Constitution, we have no authority to reverse the Court of Judicial Discipline's final order on the grounds that the motions for recusal were not granted.

We have determined that the Court of Judicial Discipline had jurisdiction to act in this matter and that it properly ordered Appellant's suspension without pay on June 3, 1994. However, it had no jurisdiction to consider the question of Appellant's disbarment nor did it have the power to impose moot sanctions. We therefore reverse the order of the Court of Judicial Discipline disbarring Appellant from the practice of law. Because we have found the remaining aspects of the order of February 4, 2000, to be moot, we vacate the entire order.

The order of June 3, 1994 is affirmed; the order of February 4, 2000 is vacated.

Concurring opinion by Judge FRIEDMAN.

I concur in the result reached by the thoughtful and well-reasoned opinion of the majority. I disagree only with respect to the majority's suggestion that the Court of Judicial Discipline continued to have jurisdiction in this case once Rolf Larsen became a former justice of the Pennsylvania Supreme Court.[1]

The question of jurisdiction is a question of law involving a determination as to a court's right to proceed with litigation. 20 Am.Jur.2d *Courts* § 54 (1995).

1. In setting forth the procedural history of this case, the majority indicates that: (1) on June 13, 1994, the Court of Common Pleas of Allegheny County removed Larsen from office under Article II, Section 7 of the Pennsylvania Constitution; and, (2) on July 5, 1994, Larsen asserted before the Court of Judicial Discipline that, because Larsen was no longer a judicial officer, the Court of Judicial Discipline lacked jurisdiction to proceed under Article V, Section 18 of the Pennsylvania Constitution. (Majority op. at 645–46.)

There are three separate elements to the jurisdiction of a court: (1) jurisdiction over the person, (2) jurisdiction over the subject matter, and (3) jurisdiction to render the particular judgment sought, or, as is sometimes said, jurisdiction of the particular case.[2]

*Id.* (footnotes omitted).

With respect to the duration of a court's jurisdiction, the general rule is as follows

[O]nce a court has acquired jurisdiction of a case, its jurisdiction continues *until the court has done all that it can do to exercise that jurisdiction,* to determine, subject to appellate review, all the issues involved, and *to grant such complete relief as is within its jurisdictional power to grant.* This does not mean, however, that a court which has acquired jurisdiction over a case cannot lose it in the course of the proceedings.

20 Am.Jur.2d *Courts* § 110 (emphasis added) (footnotes omitted). "[A] court [exercising continuing jurisdiction over a case] will be found to be acting in excess of jurisdiction when an order, although within the general power of the judge, is not authorized with respect to the particular case since conditions which authorized the exercise of the general power are absent." 21 C.J.S. *Courts* § 64 (1990).

There are courts of general jurisdiction and courts of limited jurisdiction. 20 Am.Jur.2d *Courts* § 68. Courts of limited jurisdiction are those which are clothed with special powers for the performance of specified duties, beyond which they have no authority of any kind. 21 C.J.S. *Courts* § 3. The Court of Judicial Discipline is a court of limited jurisdiction established under Article V, Section 18 of the Pennsylvania Constitution. As such, it is clothed *only* with the special jurisdictional power set forth in that constitutional provision.

Article V, Section 18(b)(5) of the Pennsylvania Constitution confers jurisdiction on the Court of Judicial Discipline "to

---

**2.** "A court can have subject matter jurisdiction over a class of cases and not have jurisdiction over a particular case due to the facts of that case." 20 Am.Jur.2d *Courts* § 54.

determine whether a *sanction* should be imposed against a *justice ... pursuant to the provisions of this section* [Section 18]." Pa. Const., Art. V, § 18(b)(5) (emphasis added). In that regard, Article V, Section 18(d)(1) of the Pennsylvania Constitution states, "A *justice ...* may be *suspended* [from office [3]], *removed from office* or *otherwise disciplined* [while retaining office] for *conviction of a felony* [or for other specified types of misconduct]...." Pa. Const., Art. V, § 18(d)(1) (emphasis added).

Thus, the jurisdiction of the Court of Judicial Discipline is limited to determining the proper discipline [the judgment sought] to impose against a sitting justice [the person] for certain types of misconduct [the subject matter].[4] This limited jurisdiction continues until the Court of Judicial Discipline has done all that it can do to exercise its jurisdictional power. If the Court of Judicial Discipline proceeds against a *former justice* and imposes discipline that is authorized only for a sitting justice, the Court of Judicial Discipline acts in excess of its jurisdictional power. This is because the conditions which would have authorized the exercise of the jurisdictional power are absent.

Specifically, once Larsen was removed from office, the Court of Judicial Discipline could no longer exercise its jurisdictional power to sanction a sitting justice. By continuing to exercise power over Larsen, a *former justice,* the Court of Judicial Discipline exceeded its jurisdictional power over the person. Even if I were to agree that the Court of Judicial Discipline's jurisdictional power over the subject matter and the person continued after Larsen was removed from office, the Court of Judicial Discipline still *lacked jurisdiction* to render the judgment sought because none of the sanctions authorized by Article V, Section 18(d)(1) of the Pennsylvania Constitution apply to a *former justice.* In other words, the

3. I agree with the majority that the Court of Judicial Discipline had jurisdiction to suspend Larsen on June 3, 1994, before his removal from office. (Majority op. at 650.)

4. When words are clear and free from all ambiguity, the letter is not to be disregarded under the pretext of pursuing its spirit. Section 1921(b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(b).

Court of Judicial Discipline erred in removing Larsen from judicial office, not because the sanction was moot, but because the Court of Judicial Discipline lacked jurisdictional power to do so. (*See* majority op. at 651, 654–55)

Given the limited jurisdiction of the Court of Judicial Discipline to determine a proper sanction to impose upon a sitting justice, I would hold that the Court of Judicial Discipline lost its jurisdiction over this particular case once Larsen became a *former justice.*

Concurring opinion by STEVENS J.

I concur in the result reached in the well-reasoned Majority Opinion. However, I respectfully do not join the Majority's conclusion that "the specific and explicit power granted to the Supreme Court by Article V, Section 10 to control the practice of law must be viewed as precluding the use of disbarment as a sanction by any tribunal other than the Supreme Court itself." I conclude that this statement is not supported by *Office of Disciplinary Counsel v. Jepsen,* 567 Pa. 459, 787 A.2d 420 (2002).

*Jepsen* indicates that, at the very least, both the Court of Judicial Discipline and the Supreme Court possess the authority to disbar judicial officers. Specifically, the Supreme Court stated that "both [the Disciplinary Board and the Court of Judicial Discipline] possess constitutionally conferred authority to entertain charges filed against a judicial officer who commits misconduct during the practice of law. Each tribunal is likewise capable of determining the appropriate discipline." *Jepsen,* 567 Pa. at 464, 787 A.2d at 423. Specifically noteworthy is the fact that the Supreme Court in *Jepsen* never explicitly stated that it was the exclusive tribunal for disbarment sanctions. I believe that if the Supreme Court intended such a conclusion, it would have specifically so indicated.

Thus, while I agree with the remainder of the Majority's Opinion, I do not agree with the Majority's interpretation of *Jepsen.* Specifically, I disagree that *Jepsen* precludes disbar-

ment as a sanction available to the Court of Judicial Discipline.[1]

Concurring and dissenting opinion by BOWES, J.

I join in the learned opinion of the majority with regard to the issue of the jurisdiction of the Special Tribunal. I further join in the majority decision that the sanctions of removal from office and preclusion from holding future office have been rendered moot by the prior rulings of the trial court and the Pennsylvania Senate, and that those portions of the Order of the Court of Judicial Discipline should be reversed.

I respectfully disagree with the majority view regarding the power of the Court of Judicial Discipline to impose the sanction of disbarment from the practice of law and join in the well-articulated Concurring Opinion of Judge Correale Stevens. I believe that the case of *Office of Disciplinary Counsel v. Jepsen*, 567 Pa. 459, 787 A.2d 420 (2002), makes clear that there are two parallel tracks for the imposition of discipline upon a judicial officer pertaining to the practice of law. Therein, the Supreme Court stated that "both [the Disciplinary Board and the Court of Judicial Discipline] possess constitutionally conferred authority to entertain charges filed against a judicial officer who commits misconduct during the practice of law. Each tribunal is likewise capable of determining the appropriate discipline." *Id.* at 464, 787 A.2d at 423. *Jepsen* involved the issue of wrongful conduct arising from the practice of law by a district justice, and the sanction at issue therein was disbarment, albeit consensual.

In support of the finding that the Court of Judicial Discipline had authority to entertain charges and determine appropriate discipline, the only language that could provide a basis for the sanction of disbarment is the language contained in the Pennsylvania Constitution, article 5, § 18(b)(5), which states that "a decision of the [Court of Judicial Discipline] may order removal from office, suspension, censure or **other discipline**

1. I did not review the merits of whether former Justice Larsen received a fair hearing as I believe that issue is beyond the scope of our authority.

as authorized by this section and as warranted by the record." (Emphasis added). I believe, as apparently did the *Jepsen* court, that this language encompasses the discipline of disbarment.

With regard to discipline imposed on a justice, the Pennsylvania Constitution further provides that a justice shall have the right to appeal to a special tribunal as authorized by article 5, § 18(c)(1). That section states that "the special tribunal shall hear and decide the appeal [of a final adverse order of discipline] in the same manner in which the Supreme Court would hear and decide an appeal from an order of the court." Pa. Const. art. 5, § 18(c)(1). I find support for my view that the Court of Judicial Discipline has the ability to disbar a justice based on the fact that disbarment is specifically referenced within article 5 of the Pennsylvania Constitution, which provides that, "[A] justice ... disbarred as a member of the bar of the Supreme Court or removed under this section shall forfeit automatically his judicial office and thereafter be ineligible for judicial office." Pa. Const. art. 5, § 18(d)(3). This reference within the very article that creates the Court of Judicial Discipline and authorizes that tribunal to impose discipline upon a Supreme Court justice compels the conclusion that disbarment falls within the ambit of that court's power.

I further believe, for the following reasons, that it is fitting and proper for sanctions, including disbarment if appropriate, to be imposed in these proceedings rather than in proceedings before the Supreme Court. A justice or, as in this case, a former justice, should not be judged by members of the court with whom he served; indeed, in my opinion this tribunal was established and endowed with the power to review sanctions imposed against a justice of the Supreme Court for this very reason. The citizens of this commonwealth, in voting to amend the Constitution and create a special tribunal, clearly sought to provide an independent and impartial venue for the review of discipline imposed upon a fallen justice. Without such a tribunal, it is easily foreseeable that the specter of recusal could result in the inability of the Supreme Court to

act. Although the Supreme Court has exclusive jurisdiction to regulate the practice of law pursuant to the Pennsylvania Constitution, the role of the special tribunal with regard to reviewing sanctions upon a justice is also founded upon express constitutional mandate and must be read and interpreted in a common sense fashion. To have one's colleagues sit in judgment is exactly what the amendment sought to avoid, and the above-cited provisions of article 5 support such a conclusion.

Moreover, I find Judge Robert Byer's comments in his concurring opinion in *In re Larsen,* 717 A.2d 39 (Pa.Jud.Disc. 1998), instructive on this issue. Therein, Judge Byer opined that subjecting a judicial officer to two different tribunals for sanctions arising from misconduct in office would be onerous, burdensome, and may result in harsher sanctions than having all sanctions imposed by one tribunal. He observed, "It makes better sense for judicial officers who are members of the bar and who are charged with violations of both the Code of Judicial Conduct and the Rules of Professional Conduct to face only a single proceeding before [the Court of Judicial Discipline] and to have all sanctions imposed at once, instead of proceedings both before this Court and the Disciplinary Board, with separate appellate review in the Supreme Court subject to different standards." *Id.* at 51–53 (Byer, J. concurring).

Having determined that the discipline of disbarment is available to the Court of Judicial Discipline, I write separately from Judge Stevens to express my belief that former Justice Larsen did not receive a fair hearing regarding the disbarment issue, and that this matter should be remanded for an evidentiary hearing limited solely to the issue of whether disbarment is an appropriate sanction.

In the present case, the record indicates that former Justice Larsen attempted to introduce evidence in mitigation to avoid disbarment. The evidence was disallowed, and he was disbarred solely based upon his felony conviction. Our Supreme Court has indicated that disbarment does not flow automatically from conviction of a crime. Instead, evidence of mitigat-

ing circumstances, including psychiatric disorders and the nature of the crime, are relevant in determining whether disbarment is warranted. *Office of Disciplinary Counsel v. Christie,* 536 Pa. 394, 639 A.2d 782 (1994); *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989). Removal from office is a severe sanction; however, equally so is disbarment from the practice of law. Former Justice Larsen should have been permitted to present evidence demonstrating that disbarment was an unsuitable punishment, and his inability to so proceed was an error of law. I would, therefore, reverse and remand for an evidentiary hearing on sanctions.